**AUBURN UNIVERSITY, Plaintiff,**

v.

**The SOUTHERN ASSOCIATION OF COLLEGES AND SCHOOLS, INC., and James T. Rogers, individually and in his official capacity as the Executive Director of the Commission on Colleges of the Southern Association of Colleges and Schools, Inc., Defendants.**

No. Civ.A.1:01–CV2069JOF.

United States District Court,
N.D. Georgia.

Jan. 15, 2002.

David N. Laband, Auburn University, School of Forestry and Wildlife Sciences, Auburn, AL, Pro se.

Peter M. Degnan, Frank Garrett Smith, III, Anne S. Rampacek, Charles Samuel Conerly, Alston & Bird, Atlanta, GA, for Plaintiff.

Frank C. Jones, Letitia A. McDonald, John Patterson Brumbaugh, King & Spalding, Atlanta, GA, Patrick W. McKee, Patrick W. McKee & Associates, Newnan, GA, for Defendants.

## ORDER

FORRESTER, District Judge.

This matter is before the court on Plaintiff's motion for a preliminary injunction [3–1]; Defendants' motion for a protective order [15–1]; Plaintiff's motion to compel [17–1]; Plaintiff's motion for discovery sanctions [18–1]; Defendants' motion for judgment on the pleadings [23–1]; Plaintiff's cross-motion for judgment on the pleadings [31–1]; and Plaintiff's motion for oral argument [35–1].

## I. Background

### A. Contentions

For reasons discussed more fully below, Defendants announced an intention to review the accreditation of the Plaintiff. Auburn University ("Plaintiff" or "Auburn") filed suit on August 3, 2001, alleging that Defendants, the Southern Association of Colleges and Schools, Inc. ("SACS"), and its Executive Director, Dr. James T. Rogers ("Rogers"), violated the Higher Education Act, 20 U.S.C. §§ 1070 *et seq.* ("HEA"), common law due process principles, and the Due Process Clause of the United States Constitution by not following its own procedures in the process and scope of the planned investigation. Auburn seeks injunctive relief to (1) force SACS to comply with its published procedures, (2) require notice concerning the operation of the Special Committee appointed by SACS to investigate Auburn, (3) limit the scope of SACS' investigation, (4) restrict the membership of the Special Committee, and (5) remove persons with actual or apparent conflict of interest from SACS' decisionmaking process.

SACS contends that all three counts of Auburn's complaint fail to state a cause of action upon which relief can be granted. SACS argues that (1) no private right of action exists under the HEA; (2) federal common law due process rights are not applicable to Auburn's suit; and (3) SACS is not a "state actor" for the purposes of due process rights under the United States Constitution; Auburn has not asserted a property right that is protected by due process; and Auburn is not a "person" protected by the due process clause. Auburn responds that a private right of action is implied in the 1992 amendments to the HEA. Auburn further argues that

courts afford "common law due process" to schools during the accreditation process and that SACS has violated that common law by not following its own procedures during its investigation. Finally, Auburn argues that because of the intertwining of federal financial aid and the recognition of SACS by the Secretary of Education, SACS is a state actor and bound by the Due Process Clause of the United States Constitution.

## B. Procedural History and Facts

On September 17, 2001, the court held a scheduling conference and determined to stay discovery while the court considered SACS' motion and Auburn's cross-motion for judgment on the pleadings which raise issues of subject-matter jurisdiction with respect to Auburn's allegations that SACS violated the HEA, common law due process, and constitutional due process. On November 19, 2001, the court heard oral argument on the parties' motions for judgment on the pleadings.

This case arises amidst a tumultuous time in the life of this institution. Historical events that may have fueled some of the clamor included the dismissal of the University's President and athletic coaches, and the denial of tenure to a faculty member whose views were controversial. It proceeds in part upon charges that one of the Board of Trustees seeks to operate the school as his personal fiefdom and that other trustees have conflicts of interest in that their enterprises do business with the University.

In late 2000 and early 2001, the Board of Trustees at Auburn determined that it was interested in replacing Dr. William V. Muse as President of Auburn University. In February 2001, Dr. Muse announced he had accepted an offer to become Chancel-

lor of East Carolina University at the conclusion of the present school term. On February 12, 2001, the Board of Trustees discharged Dr. Muse and selected Provost William F. Walker as Interim President of Auburn. In the first few months of 2001, nine groups of university stakeholders representing faculty, student, staff, administration and professional employees returned votes of "no confidence" in the Board of Trustees.

In April of 2001, a letter was sent to Defendant SACS[1] invoking the accreditation agency's complaint procedure. The letter reported ten examples of violations of SACS' *Criteria for Accreditation*. It was submitted by the Joint Assessment Committee of the school, and an ad hoc committee of the University Senate. Prior to the submission of this Letter Complaint, representatives of SACS communicated with the Joint Assessment Committee on matters included in the Letter Complaint. *See* Verified Cmplt., ¶ 17. Dr. Muse and Dr. Rogers also communicated about the issues raised in the Letter Complaint prior to its submission. *Id.* In April 2001, SACS' staff visited Auburn University, and Dr. Rogers considered sending a Special Committee at that time. *See* Answer, ¶ 16.

Under SACS' rules, there are two procedures which may be used to look into accreditation issues at member institutions. One is the formal complaint procedure which was triggered here by the Letter Complaint. Under that procedure, if SACS' staff determines that there is evidence of lack of compliance with the *Criteria for Accreditation*, a copy of the complaint is sent to the president of the institution, and an opportunity is afforded to make a response. After the Executive Director of SACS receives the staff re-

---

1. SACS is the sole accrediting association recognized by the Secretary of Education to accredit institutes of higher education in Alabama and ten other southern states. Auburn has been an accredited member of SACS since 1922.

port, he may determine that the complaint has sufficient substance to warrant further investigation. Presumably this is conducted by staff. The Committee on Criteria & Reports, a standing committee of the Committee on Colleges, may conduct an interview with the institution. The institution may submit additional information to that committee before the interview and may call five witnesses to answer questions. Final action is taken only by the Committee on Colleges based on the report of the Committee on Criteria & Reports. If accreditation is withdrawn, there is the possibility of an appeal. *See generally* SACS' Policies, Procedures, Guidelines, at 45–48.

SACS' rules also permit the appointment of a special committee "to evaluate institutional circumstances" that are determined to be "accreditation related" and that are not the "work of other visiting committees." Although the special committee is focused on issues that brought about its appointment, it is free to look into other matters. The rules do not require that the institution be advised of the issues, nor do they require that it be given an opportunity to respond during the investigation. The institution may be given an opportunity to respond to the Committee on Criteria & Reports on the final report of the Special Committee, but only if time permits. *See generally* SACS' Policies, Procedures, Guidelines, at 85–86.

Although SACS already had a formal complaint, about two weeks after it was received, on May 8, 2001, Dr. Gerald Lord[2] sent a memo to the Criteria & Reports Committee discussing whether a Special Committee should be appointed. *See* Pl.'s Mot. for Judgment on the Pleadings, Exh. I. Attached to that memo are newspaper articles about recent events at Auburn. *Id.* Also attached is a May 8, 2001 letter from the Auburn chapter of the

American Association of University Professors ("AAUP"). Auburn did not receive this letter until May 14, 2001. *Id.,* Exh. B. The AAUP letter indicates that it is in support of the April 24, 2001 Letter Complaint. *Id.* On July 3, 2001, Dr. Rogers sent a letter to Dr. Walker indicating that at the June 1, 2001 Commission meeting, the Commission authorized a Special Committee to investigate Auburn's compliance with the *Criteria for Accreditation,* Sections 1.4, 5.5.2, and 6.1.2. The Special Committee was also authorized to investigate any formal complaints lodged with SACS against the university if SACS' staff deemed it necessary to investigate. *See* Answer, Exhs. A & B.

Given the widespread concerns about the lack of propriety of certain of the actions of the trustees and the failed efforts to reach accommodation within the University community, resort to an outside agency with the power to force change might be expected. Instead, they address (1) the allocation of power between the faculty and administration and the trustees or (2) misfeasance or malfeasance of some of the trustees. These are policy issues of the highest order of primacy for a public institution, but as the court understands the items in the formal complaint, none directly focuses on the mission of Auburn University as a research and educational institution. In choosing to seek redress with SACS, the complainants have chosen the gatekeeper for funds from the United States Secretary of Education, and have bypassed the members, of the executive and legislative bodies of the State of Alabama. If a federal surrogate is to propose policy or judge state-appointed college trustees, considerations of comity alone dictate a fastidiously fair protocol.

Auburn comes before this court seeking a decision that the investigation be con-

**2.** Dr. Lord is the Associate Executive Director of SACS.

ducted in a way that provides for fundamental fairness or, in the language of the law, due process.[3] The University has cause for its concerns. As this case began, it faced investigation under the "Special Committee" process which has no provision for meaningful notice and opportunity to be heard. As noted above, the complaint began with consultation between its drafters and SACS' staff. There were conversations between the aggrieved former president and the Executive Director of SACS about the time the matter commenced. The "complaint procedure" is structured in such a way as to weed out non-meritorious claims. However, as discussed below, SACS' staff forwarded the entire complaint to Auburn for response, although several of the issues are not controlled by SACS' accreditation criteria.

The decision to appoint a Special Committee seems curious as the complaint procedure had begun to function, and there is no indication that new issues had come to SACS' attention. This is not a time for the court to ascribe motive, but the effect of the change cannot go unnoticed. With the complaint procedure there is a standing committee, the Committee on Criteria & Reports; with the Special Committee an ad hoc committee is picked by SACS' staff. Because there was another committee assigned to the work, it is questionable whether it was proper even to appoint a Special Committee. Also, with the Special Committee, procedural safeguards are lost, and the Special Committee is not limited in the matters it may investigate. Given the

appearance of partisan inclinations that might be inferred from the beginning of the investigation; SACS' defense that no one has actually been harmed yet is of little solace.

## II. Discussion

### A. Due Process

Before considering Auburn's contention that SACS must comply with due process, a review of the history of accreditation of institutes of higher education in the United States is helpful. In the late nineteenth century, a number of voluntary associations were created in an attempt to formalize the country's system of higher education. *See generally* Matthew W. Finkin, The Unfolding Tendency in the Federal Relationship to Private Accreditation in Higher Education, 57 Law & Contemp. Probs. 89 (1994); Lisa P. Baar, The Higher Education Amendments of 1992: Resolving the Conflict over Diversity Standards and Institutional Eligibility for Title IV Aid, 30 Harv. J. on Legis. 253, 258, 265–66 (1993). These organizations were not part of the federal government because of the traditional conception that education was not a federal concern, but rather was an issue left to local governments. The standards used by the regional associations varied during the course of the twentieth century, but eventually evolved into the notion that an institution should be evaluated in relation to the educational mission it established for itself.

---

**3.** Justice Frankfurter described due process in *Joint Anti–Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951):

Representing a profound attitude of fairness between man and man, and more particularly between the individual and government, 'due process' is compounded of history, reason, the past course of decisions, and stout confidence in the strength of the democratic faith which we profess. Due process is not a mechanical instrument. It is not a yardstick. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment by those whom the Constitution entrusted with the unfolding of the process.

*Id.* at 162–63, 71 S.Ct. 624 (concurring opinion).

The federal government became involved in the accreditation process when the government required institutes of higher education to be accredited in order for the school and its students to qualify for federal financial aid. The predecessor to the Department of Education was first given statutory authority to "recognize" accrediting agencies in the G.I. Bill passed during the Korean War. *See* Pub.L. No. 82–550, 66 Stat. 663 (1952). Congress wanted to assure that federal money was not being spent on "fly by night" educational programs. To that end, the Commissioner of Education was authorized to "publish a list of nationally recognized accrediting agencies and associations which he determines to be reliable authority as to the quality of training offered by an educational institution." *Id.* at 675. The cooperative efforts of the federal and state governments working with the accrediting agencies became known as the "triad." The continued reliance on a "private" system to regulate the accreditation of institutions again appears to have its origins in congressional desire to maintain local control over education and to avoid the development of federal standards for educational policy. *See* 20 U.S.C. § 3403(a) ("The establishment of the Department of Education shall not increase the authority of the Federal Government over education or diminish the responsibility for education which is reserved to the States and the local school systems and other instrumentalities of the States.").

Federal financial aid, however, increased in importance when Congress passed the Higher Education Act of 1965, which established federal financial aid programs beyond students who were veterans of the armed services. As the federal government became more involved in the accrediting process, accrediting associations became concerned that their educational independence would be threatened by such cooperation. The executive director of an association of accrediting agencies testified in 1974 that

> accrediting organizations have been enticed to become reluctant extensions of the U.S. Office of Education in order that the accredited schools, programs, and colleges might share in the largesse writ large. Many now would like to break off the relationship, and some have indicated they intend to do so, in order to return to the prerogative which historically and professionally has belonged to them—that of promoting and insuring quality programs of education. All are capable of doing just that and are perfectly willing to abide the scrutiny of the federal benefactor in so doing. They are not willing much longer to abide the prod which inevitably has followed the scrutiny.

Hearings before the Subcomm. on Education of the Senate Comm. on Labor and Public Welfare, 93d Cong., 2d Sess. 237 (1974).

In 1992, following investigations related to the high rate of default in the student loan program, Congress again amended the terms of the Higher Education Act to include a subsection on "Program Integrity" to assure reliability in the distribution of federal aid to educational institutions. Under the amendments, Congress continues to delegate to the Secretary of Education the responsibility of determining whether an accrediting agency should be recognized as "a reliable authority as to the quality of education or training offered." 20 U.S.C. § 1099b(a). The Secretary may promulgate regulations setting forth the criteria for recognition. If an accrediting agency fails to meet these criteria, the Secretary has the option of terminating his recognition of the agency. *See* 20 U.S.C. § 1099b(1). The amendments set forth several requirements placed on the accrediting agencies, including: that they be "separate and indepen-

dent" from trade associations; have public participation on the agencies' governing boards; have operating procedures that include provisions for arbitration and due process, specifically "adequate specification of requirements and deficiencies," "notice of an opportunity for a hearing," a "right to appeal any adverse action," and a "right to representation by counsel"; that they perform site visits; and inform the Secretary of Education of any adverse decisions in the accrediting process within thirty days. *See generally* 20 U.S.C. § 1099b. For the first time, the amendments also provide for statutory requirements related to the substance of accreditation. Specifically, accrediting agencies must review student achievement, faculty, curricula, admissions practices, completion rates, default rates in student loan programs, and facilities; although the agency may go beyond these categories in its review of educational institutions. *See* 20 U.S.C. § 1099b(a)(5) and 1099b(g).

In developing the regulations to implement the 1992 amendments, the Secretary of Education described the HEA as providing "the framework for a shared responsibility among accrediting agencies, States, and the Federal government to ensure that the 'gate' to Title IV, HEA [financial aid] programs is opened only to those institutions that provide students with quality education or training worth the time, energy, and money they invest in it." 59 Fed.Reg. 22250, 22250 (April 29, 1994). The Secretary also noted that the 1992 amendments "significantly increased the gatekeeping responsibilities of each member of the triad" by enacting "requirements that accrediting bodies must meet if they are to be recognized by the Secretary as 'gatekeepers' for Title IV or other Federal purposes." *Id.* He indicated that the Department of Education would "take steps to ensure that the various responsibilities of the triad members are carried out in a manner that, in fact, results in the identification of institutions that should not be eligible to participate in the Title IV, HEA programs, on the basis of either the quality of education they offer or their inability to handle program funds" because "the Secretary is committed to effective management of the gatekeeping function." *Id.*

 Apparently, due to the increased involvement of the government in the accreditation process, over the course of the past thirty to forty years, courts have developed a theory of "common law due process" to which educational institutions are entitled. A review of these cases demonstrates that the notion of "common law due process" evolved from the *Falcone v. Middlesex County Medical Society*, 34 N.J. 582, 170 A.2d 791, 800 (1961), and *Blende v. Maricopa County Medical Society*, 96 Ariz. 240, 393 P.2d 926, 930 (1964), line of cases holding that where membership in private associations is a "virtual prerequisite" to the practice of a given profession, courts must scrutinize the procedures used by the association to assure that they are reasonable, while giving deference to the "specialized competence" of the association. *See Foundation for Interior Design Educ. Research v. Savannah College of Art & Design*, 244 F.3d 521, 527 (6th Cir. 2001) (discussing *Falcone* and *Blende*).

 Few cases discuss in detail the origins of the notion of "common law due process," but rather simply apply it in the accreditation process, finding that private accrediting agencies are "quasi-public" institutions. *Parsons College v. North Central Association of Colleges & Secondary Schools*, 271 F.Supp. 65 (N.D.Ill.1967), was the first case to discuss such notions in the accrediting context. After determining the accrediting agency was not a state actor, the court never analyzed why the accrediting agency, a private actor, should be bound by due process, but merely held that the agency's decision would not be

reversed unless it was found to be "contrary to rudimentary due process or grounded in arbitrariness." *Id.* at 71 (quotation and citation omitted). The court also concluded that the accrediting agency had not violated any of its own rules. *Id.* at 72. *See also Marjorie Webster Junior College, Inc. v. Middle States Ass'n of Colleges & Secondary Schs.,* 432 F.2d 650, 655 (D.C.Cir.1970) ("The standards set must be reasonable, applied with an even hand, and not in conflict with the public policy of the jurisdiction."); *Rockland Inst. v. Association of Indep. Colleges & Schs.,* 412 F.Supp. 1015, 1016 (C.D.Cal.1976).

■ At times, the application of "common law due process" parallels judicial review in administrative law. In a case that also involved SACS, the Fifth Circuit rejected SACS' argument that state law should apply to the plaintiff's suit because "[f]ederal courts have consistently limited their review of decisions of accrediting associations to whether the decisions were 'arbitrary and unreasonable' and whether they were supported by 'substantial evidence.'" *Wilfred Academy of Hair & Beauty Culture v. Southern Association of Colleges & Schs.,* 957 F.2d 210, 214 (5th Cir.1992) (citations omitted). The court further found that courts generally have afforded determinations of the associations great deference and "focus primarily on whether the accrediting body's internal rules provide a fair and impartial procedure and whether it has followed its rules in reaching its decision." *Id.; see, e.g., Medical Institute of Minn. v. NATTS,* 817 F.2d 1310, 1314 (8th Cir.1987) ("Although not governed by constitutional guidelines, [the accrediting agency] nevertheless must

conform its actions to fundamental principles of fairness. These principles are flexible and involve weighing the 'nature of the controversy and the competing interests of the parties.' ").

■ As an initial matter, the court finds "common law due process" a peculiar body of law.[4] Due process does not exist between private parties. *See Jeffries v. Georgia Residential Finance Authority,* 678 F.2d 919, 922 (11th Cir.1982) ("It is well settled that the fourteenth amendment proscription against deprivations of property without due process of law reaches only government action and does not inhibit the conduct of purely private persons in their ordinary activities."). The norm is that private parties can act arbitrarily and capriciously and with cause or without cause. Although courts consistently stress that accrediting agencies are "private" actors, *see Transport Careers, Inc. v. National Home Study Council,* 646 F.Supp. 1474, 1479 n. 4 (N.D.Ind.1986) ("American traditions of academic freedom militate against imposing constitutional obligations upon private accrediting bodies. To do so would undermine the independence of those bodies from governmental control."), they have felt compelled to apportion some kind of public attribute to these agencies presumably because the agencies have become the gatekeeper to federal financial aid funds without which schools would be unable to function. *See, e.g., Marlboro Corp. v. Association of Indep. Colleges & Schs.,* 556 F.2d 78, 79–80 (1st Cir.1977) (discussing accrediting agencies as "quasi public" organizations).

Yet courts seem equally compelled to deny that accrediting agencies are state

---

4. Even courts applying this "common law" have done so with some hesitation. *See Marjorie Webster Junior College, Inc. v. Middle States Ass'n of Colleges & Secondary Schs.,* 432 F.2d 650, 655–56 (D.C.Cir.1970) ("Particularly when, as here, judicial action is predicated not upon a legislative text but upon the developing doctrines of the common law, general propositions must not be allowed to obscure the specific relevant facts of each individual case.").

actors.[5] *See Chicago Sch. of Automatic Transmissions, Inc. v. Accreditation Alliance of Career Schs. & Colleges,* 44 F.3d 447 (7th Cir.1994). In *Chicago School,* the Seventh Circuit stated:

> [a]lthough the law of every state contains a set of rules for the conduct of voluntary associations, distinct from the law of contracts, this too is not quite the right match; the School did not apply to "join" the Alliance. It wanted a key that would unlock the federal Treasury. An accrediting agency is a proxy for the federal department whose spigot it opens and closes.

*Id.* at 449. Perhaps realizing this pronouncement bordered on a declaration of state action, the court then added the following footnote:

> Which is not at all to imply that an accrediting agency is a "state actor" or "federal actor" with special constitutional obligations in addition to those created by statutes and common law. A governmental body may rely on the decisions of a private association without turning that association into "the government" itself. *See Sanjuan v. American Board of Psychiatry & Neurology, Inc.,* 40 F.3d 247, 250 (7th Cir.1994). It is the Secretary of Education, and not the Alliance, that must conform the government's ultimate decision to the Constitution. The School does not raise any constitutional argument; we men-

---

5. *See, e.g., McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.,* 24 F.3d 519 (3d Cir.1994) (decision of private accrediting agency not state action); *Medical Inst. of Minn. v. National Ass'n of Trade & Technical Schs.,* 817 F.2d 1310 (8th Cir.1987) (agency's decision to deny reaccreditation not attributable to federal government even though decision affected eligibility for federal funds); *Marlboro Corp. v. Association of Indep. Colleges & Schs.,* 556 F.2d 78, 79–80 (1st Cir. 1977) ("Whether the Commission's procedures are ... immune from constitutional scrutiny is a close question. While it is true that there is no governmental participation in [the accrediting agency] ... it appears that if [the accrediting agency] did not perform the accreditation function, 'government would soon step in to fill the void.' "); *Peoria Sch. of Business, Inc. v. Accrediting Council for Continuing Educ. & Training,* 805 F.Supp. 579, 582 (N.D.Ill.1992) ("ACCET is a private corporation acting independently from the government. That its decision may deprive Peoria students of governmental financial assistance is insufficient in itself to subject ACCET's actions to the rigors of the Fifth Amendment.... Moreover, that the procedures and criteria used by ACCET in its accrediting determinations are specified and limited by the Department of Education regulations for nationally recognized accrediting agencies, is likewise insufficient to attribute ACCET's actions to the federal government.... Peoria has not cited, and we have

not found, any persuasive authority to conclude that ACCET's accreditation function constitutes state action for purposes of the Fifth Amendment."); *Transport Careers, Inc. v. National Home Study Council & Accrediting Comm'n,* 646 F.Supp. 1474, 1479 (N.D.Ind.1986) ("[T]he fact that an accrediting association's decision in granting or denying accreditation may have some effect under governmental programs does not give rise to state action."); *Parsons College v. North Cent. Ass'n of Colleges & Secondary Schs.,* 271 F.Supp. 65, 70 (N.D.Ill.1967) ("The fact that acts of the Association in granting or denying accreditation may have some effect under governmental programs of assistance to students or colleges does not subject it to the constitutional limits applicable to government, any more than a private employer whose decision to hire or fire may affect the employee's eligibility for governmental unemployment compensation."). *But cf. Marjorie Webster Junior College v. Middle States Ass'n of Colleges & Secondary Schs.,* 302 F.Supp. 459, 470 (D.D.C.1969) (private accrediting association's actions constituted government action because association acted in "quasi-governmental capacity by virtue of its role in the distribution of Federal funds under the 'aid to education statutes' "), *rev'd on other grounds,* 432 F.2d 650 (D.C.Cir. 1970).

tion this point only to guard against reading into our opinion something that it does not contain.

*Id.* at 449 n. 1. The court then applied principles of federal administrative law to the school's suit and concluded that the "Alliance did not act arbitrarily, and it did not violate any of its rules" in its treatment of the school's claim. *Id.* at 451.[6]

■ Courts cite the trilogy of cases decided by the Supreme Court in 1982 when holding that accrediting agencies are not state actors. In *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), the Court found no state action when a private school for maladjusted students fired faculty members even though all students at the school were referrals from the public school system, their tuition was paid for by the state, and government regulation controlled portions of the school's program. The Court held that the public function doctrine applies only when the functions performed are "traditionally the exclusive prerogative of the State." *Id.* at 842, 102 S.Ct. 2764. The Court also noted that the

> school ... is not fundamentally different from many private corporations whose business depends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government. Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts.

*Id.* at 840–41. In *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), the Court found that a private nursing home's decision to transfer or discharge patients did not constitute state action even though the decision directly affected the patients' eligibility for Medicaid benefits. The Court found that although the state responded to the nursing home's action by adjusting benefits, the state was not responsible for those actions. *Id.* at 1005. The Court held that "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.* at 1004, 102 S.Ct. 2777. State action may be found if the private entity has exercised powers that are "traditionally the exclusive prerogative of the State." *Id.* at 1005, 102 S.Ct. 2777 (the "public function" test). · *See also Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 941, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (state action present if action of private entity is "fairly attributable" to state or where private actor operates as "a willful participant in joint activity with the State or its agents."). In cases after 1982, the Supreme Court continued to apply a restrictive analysis of state actor. *See, e.g., National Collegiate Athletic Association v. Tarkanian,* 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988) (NCAA not state actor even though it set standards and enforcement mechanisms); *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee,* 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) (court rejected argument that USOC was state actor even though Congress established its corporate charter, imposed requirements on its operation and provided it with grant of funds).

**6.** Accrediting agencies are not like established government agencies because there is something of a private character attributable to an organization such as SACS that is not subservient in any direct or indirect way to political regulation. SACS is not accountable to a governance that is responsive to the body politic. Perhaps courts have felt the need to be extra vigilant because there is no other actor to check the worst impulses of the human spirit.

The question before the court, then, is whether the Supreme Court's decision last term in *Brentwood Academy v. Tennessee Secondary School Athletic Association,* 531 U.S. 288, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001), should alter the court's interpretation of *Blum* and *Rendell–Baker.* In *Brentwood,* the Court held that the Tennessee Secondary School Athletic Association (the "Association"), a not-for-profit membership corporation, was a state actor subject to suit under 42 U.S.C. § 1983. Brentwood Academy, a private high school, sued the Association seeking to prevent the enforcement of a rule that prohibited the use of undue influence in the recruitment of student athletes. The Court noted that "the deed of an ostensibly private organization or individual" might be treated "as if a State has caused it to be performed." *Id.* at 930. "[S]tate action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Id.* In making this finding, the Court relied on a "pervasive entwinement" theory based on "management and control" that considers an organization's "expressly private characterization in statutory law [and] the failure of the law to acknowledge [the organization's] inseparability from recognized government officials or agencies." *Id.* at 931. The Court distinguished *NCAA v. Tarkanian,* 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988), by stating that an association with a substantial number of public school members would have a greater effect on a private school in the same state than the effect public universities throughout the country in the NCAA would have on the University of Nevada at Las Vegas. *Id.* The Court also distinguished *Rendell–Baker* by noting the fact that association members in *Brentwood Academy* "give up sources of their own income [through gate receipts] to their collective association" is different from public school districts that contract to buy services from a private school, as in *Rendell–Baker. Id.* at 932.

Here, a primary factor weighing against finding that SACS is a state actor is that accreditation has never been a public function. However, the 1992 amendments to the HEA appear to have brought the Secretary of Education in a much closer relationship with the accrediting agencies' actions. As described above, the HEA and accompanying statutes set forth in greater detail the criteria an agency must use in order to be recognized by the Secretary of Education, as well as the agency's operating procedures. *See generally* 20 U.S.C. § 1099b and 34 C.F.R. Part 602. *Cf. Medical Institute of Minn. v. NATTS,* 817 F.2d 1310, 1313–14 (8th Cir.1987) (rejecting argument that accrediting agency was state actor because the procedures and criteria used to make accreditation decisions were limited by regulations promulgated by the Department of Education, noting that the Department of Education's regulations "in no way limit or define the criteria NATTS must use when deciding whether to accredit an institution," but finding that even if regulations did so specify, it would not be enough to compel a finding of state action). It may be that the Court's "pervasive entwinement" theory articulated in *Brentwood Academy* will supercede the legal fiction of courts denying that accrediting agencies are state actors, but declaring them to be "quasi public" organizations bound by "common law due process."

## B. Application of Due Process

 In any event, under the precedent of authority developed to this stage, Auburn is entitled to some kind of "due process" at this stage in the accrediting process. The essential elements of due

process are notice and an opportunity to respond. *See Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Due process, however, is a flexible concept and the particular application of due process varies "as the factual situation demands." *Mathews v. Eldridge,* 424 U.S. 319, 349, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In assuring adequate protection, a court must consider the private interests affected, "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and the state's interest. *Id.* at 335, 96 S.Ct. 893. *See also Marlboro Corp. v. Association of Indep. Colleges & Schs.,* 556 F.2d 78, 81–82 (1st Cir.1977) ("[w]hether the process is measured against constitutional or common law standards, current doctrine teaches that procedural fairness is a flexible concept, in which the nature of the controversy and the competing interests of the parties are considered on a case-by-case basis."). Absent binding authority in this circuit, the court finds that under these circumstances, Auburn challenges not the denial of accreditation or the imposition of some other sanction, but rather the process of investigation that could potentially lead to those ends. On the pendulum of "due process," Auburn's need for protection, then, would not under ordinary circumstances be strong at this stage in the investigation. However, because of the inauspicious manner in which SACS began its investigation and because SACS will be imposing its judgment on matters of prime importance to the State of Alabama whose interest in the particular issues is seen as paramount, an open, fair and deliberative process seems essential to protect all interests and to assure some measure of confidence in the outcome of the inquiry. *See also Cooper v. Salazar,* 196 F.3d 809, 816 (7th Cir.1999) (where agency's findings are granted increasingly deferential standards of review at each level of appeal, due process requires that an opportunity to be heard "be afforded at a 'meaningful' time").

Although SACS made certain concessions during oral argument that moot a portion of Auburn's complaint, the court finds it necessary to comment on these issues further for several reasons. While SACS now represents that it does not intend to investigate issues beyond the scope of its *Criteria for Accreditation,* it is undisputed that SACS forwarded to Auburn and requested a response to the Letter Complaint without indicating to Auburn that it would not investigate those concerns outside the scope of accreditation issues. Furthermore, the evidence developed at the hearing seems to indicate that SACS' staff initiated an investigation separate from the formal complaint. By SACS' own admission, *see* Hearing Transcript, at 52–53, that investigation was not protected by the full panoply of due process protections that would govern a formal investigation. It was not until the hearing that SACS confirmed it would follow the more fully protected process of the formal investigation. Thus, at the time SACS informed Auburn that it was appointing a Special Committee, Auburn did not know whether the investigation of that Special Committee would be governed by the rules for a formal complaint. As such, the court comments on those aspects of Plaintiff's complaint not addressed by SACS' representations.

Auburn indicates five areas in which SACS' behavior does not meet the requirements of due process: (1) failure to follow SACS' own complaint procedure, (2) intent to investigate complaints outside the scope of SACS' accreditation criteria, (3) intent to investigate issues previously examined by SACS, (4) composition of members of

the special committee, and (5) conflict of interest among individuals involved in the investigation.

As an initial matter, although Auburn argues that SACS' decision to investigate matters already examined by SACS is "harassment, and certainly constitutes a violation of due process and a manifest waste of time and money," Plaintiff's Brief, at 24, the court finds that relitigation or reinvestigation is not a harm against which courts traditionally have protected pursuant to due process. There is always the possibility that new evidence will come to light. Furthermore, Auburn cites no provision of SACS' own governing rules that such an investigation would violate.

Additionally, Auburn argues that the composition of the Special Committee violates due process because it is composed of three university presidents who Auburn presumes will be biased toward a position that favors maximum influence of presidents and minimal interference by boards of trustees. At oral argument, SACS agreed to follow "the procedure as outlined for formal complaints." *See* Hearing Transcript, at 56. On further study of the papers, the court has learned that the complaint procedure refers any committee work to the Committee on Criteria & Reports. The court does not believe that SACS meant that it agreed not to use the Special Committee it had caused to be formed, because that issue was not specifically addressed. It now seems to the court that the use of that Committee would violate SACS' own rules and, therefore, deny due process to Auburn. *See Chicago Schools,* 44 F.3d at 451 (when reviewing accrediting agency's actions, court considers whether agency followed its own rules); *Wilfred Academy,* 957 F.2d at 214 (same); *Parsons College,* 271 F.Supp. at 72 (same). This outcome moots Auburn's concern about the makeup of the Committee.

### 1. Conflict of Interest

■ Auburn asks that those persons with the appearance of or actual conflict of interest be removed from involvement in SACS' investigation of Auburn. Courts have considered conflicts of interest in applying notions of due process to the accreditation process. *See Wilfred Academy,* 957 F.2d at 214 (agency must have impartial procedure). As Auburn argues, SACS' own policies caution against conflicts of interest. *See Policies, Procedures, Guidelines:* Conflict of Interest: Policy Relating to Commissioners, Visiting Committee Members, and Commission Staff, at 48–50. Specifically, SACS' policy states that the "Commission on Colleges expects members of the Commission and its standing committees to recuse themselves from decisions pertaining to any institution when representatives of the institution have attempted to influence a Commissioner or a member of the Commission's standing committee regarding the institution's impending case." *Id.* at 49. SACS also instructs that "Commission staff members should be sensitive to personal situations which might present conflicts of interest in their relations with member and applying institutions." *Id.* at 50. Among other possibilities, a conflict of interest exists if a staff member has "a strong bias regarding the institution" or "has any other relationship which would serve as an impediment to rendering an impartial, objective professional judgment regarding the accreditation of an institution." *Id.*

Here, Auburn indicates that Dr. Rogers thought of sending a Special Committee to Auburn as early as when Dr. Muse's removal as President was announced. Auburn also alleges that Dr. Rogers had *ex parte* communications with Dr. Muse and the authors of the Letter Complaint. The court finds that at this stage of factual development these allegations are insuffi-

cient to show actual or apparent conflict of interest. It is unsurprising that the Executive Director of SACS would have contact with the president of one of the universities accredited by SACS. Furthermore, the injunctive relief sought by Auburn—prohibiting any SACS official who discussed matters in the scope of investigation from further decisionmaking in the investigation—could render SACS with no officials to make decisions. At this stage in the proceedings, the court declines to grant Auburn any relief on its conflict of interest claims. The court, however, will permit Auburn to conduct discovery on whether SACS' staff or Dr. Rogers is operating under a conflict of interest.

### 2. Following Agency's Own Rules

#### a. Appointment of a Special Committee

Because SACS has represented that it intends to follow the procedures of the formal investigative process, the court need not address Auburn's argument that SACS did not follow its own procedures in appointing a Special Committee to investigate Auburn.

#### b. Scope of Investigation

■ Auburn alleges that the following five areas of SACS' intended investigation go beyond any standards of accreditation published by SACS: (1) the methods by which trustees of a public university must be selected, (2) the authority of boards of trustees to select or remove presidents, (3) allocation of governance responsibilities between boards of trustees and administration with respect to minimum standards for admission, retention, graduation, grade forgiveness, tenured positions, communications between trustees and University employees, and decisions concerning athletic programs, (4) compliance with state open meeting laws, and (5) regulation of business dealings among trustees and the University.

During the arguments on the parties' motions for judgment on the pleadings, SACS' representations mooted several aspects of Auburn's requested injunctive relief. SACS admitted *in judicio* that (1) it will follow the more rigorous formal complaint procedure in investigating the Letter Complaint against Auburn, *see* Hearing Transcript, at 52, 54–56; (2) it will not investigate the manner in which trustees are selected, *see id.* at 58; (3) any investigation regarding the discharge of Dr. Muse would be limited to Criteria 6.1 and whether the Board was influenced by improper pressure, *see id.* at 58–59; and (4) it will not investigate whether the Board complied with Alabama's open meetings laws, *see id.* at 62.

Based on the representations made by SACS at the hearing, the court need not address issues one, two, and four. With respect to the other areas noted by Auburn, the court makes the following analysis. SACS contends that the other intended areas of investigation come under the purview of the *Criteria for Accreditation* in Conditions of Eligibility 3 and 4 and Criteria 5.5.2 and 6.1.2. Those provisions state:

> The institution **must** have a governing board of at least five members, which has the authority and duty to ensure that the mission of the institution is implemented. The governing board is the legal body **responsible** for the institution. Evidence **must** be provided that the board is an active policy-making body for the institution. The board **is** ultimately **responsible** for ensuring that the financial resources of the institution are used to provide a sound educational program. The board **must** not be controlled by a minority of board members or by organizations or interests separate

from the board. The presiding officer of the board **must** have no contractual, employment, or personal or familial financial interest in the institution. The majority of other voting members of the board **must** have no contractual, employment, or personal or familial interest in the institution.

The bylaws of the board or other legal documents **must** ensure appropriate continuity in the board membership, usually by staggered terms of adequate length. The bylaws or other legal documents **must** ensure the independence of the board. Amendment of the bylaws **must** occur only by vote of the board after reasonable deliberation. . . .

Condition of Eligibility 3, *Criteria for Accreditation,* at 10–11.

The institution **must** have a chief executive officer whose primary responsibility is to the institution. The chief executive officer **must** not be the presiding officer of the board.

Condition of Eligibility 4, *Criteria for Accreditation,* at 11.

The administration **must** control the athletics program and contribute to its direction with appropriate participation by faculty and students and oversight by the governing board. Ultimate responsibility for that control **must** rest with the chief executive officer. It is **essential** that responsibilities for the conduct of the athletics program and for its oversight be explicitly defined and clearly understood by those involved.

Intercollegiate Athletics, Administrative Oversight, *Criteria for Accreditation* 5.5.2, at 63.

Although titles and functions vary, the governing board **is** the legal body responsible for the institution and for policy making. . . . Except under clearly defined circumstances, board action **must** result from a decision of the whole, and no individual member or committee can take official action for the board unless authorized to do so.

The duties and responsibilities of the governing board **must** be clearly defined in an official document. This document must also specify the following: the number of members, length of service, rotation policies, organization and committee structure, and frequency of meetings. There **must** be appropriate continuity in the board membership, usually provided by staggering terms of adequate length. In addition, the document should include provisions governing the removal of a board member from office. A board member **may be** dismissed **only** for cause and by procedures involving due process.

The responsibilities of the governing board **must** include the following functions: establishing broad institutional policies, securing financial resources to support adequately the institutional goals, and selecting the chief executive officer. In addition, the governing board **must** have in place proper procedures to ensure that it is adequately informed about the financial condition and stability of the institution. The board **must** not be subject to undue pressure from political, religious or other external bodies. Furthermore, it should protect the administration from similar pressures.

There **must** be a clear distinction, in writing and in practice, between the policy-making functions of the governing board and the responsibility of the administrators and faculty to administer and implement policy. General institutional policies should originate within the board or should be approved by the board upon recommendation of the administration. Once these have become official policies, the administration should implement them within a broad framework established by the board.

Administrative Processes, Organization and Administration, Governing Board, *Criteria for Accreditation* 6.1.2, at 66.

### (1) Allocation of Governance Responsibilities Between Trustees and Administration

SACS intends to investigate the allocation of governance responsibilities at Auburn with respect to minimum standards for admission, retention, graduation, grade forgiveness, tenured positions, communications between trustees and University employees, and decisions concerning athletic programs. Pointing to regulations adopted by the Department of Education pursuant to the HEA, Auburn argues that any policies adopted by the accrediting agency much be generally accepted. *See* 34 C.F.R. § 602.13 (implementing 20 U.S.C. § 1099b and stating that the accrediting "agency must demonstrate that its standards, policies, procedures, and decisions to grant or deny accreditation are widely accepted in the United States" by educational institutions and the relevant licensing bodies). Because Auburn asserts that proper allocation of these governance responsibilities has been a point of public debate with no general consensus, Auburn contends they cannot be a subject of accreditation. As discussed below, because the court finds there is no private right of action under the HEA for suits which do not challenge the "denial, withdrawal, or termination of accreditation" by an accrediting agency, whether the allocation of governing responsibilities is debated is inapposite to the scope of process due Auburn at this stage in SACS' investigation. The court must next consider whether the allegations raised in the Letter Complaint come within the scope of SACS' *Criteria for Accreditation.*

The Letter Complaint alleges that in 1988, the Board of Trustees approved new minimum standards for admission, retention, and graduation that were developed by a Board committee, rather than those earlier approved by the University Senate and the President. Under section 6.1.2 of the *Criteria for Accreditation,* however, it is the Board's responsibility to set general institutional policies. As such, the court finds that this allegation does not relate to the allocation of governance responsibilities between trustees and administration under the *Criteria for Accreditation.* Similarly, the court finds the allegation that in 1999–2000, the Board "micromanaged" academics by demanding a new grade forgiveness policy does not relate to the allocation of governance responsibilities because it is the Board's responsibility to set general institutional policies.

The court finds, however, that the allegations that there is a lack of institutional control over athletics and that Board decisions concerning athletics reflect control of the Board by a minority do come within the scope of *Criteria for Accreditation,* 5.5.2, which requires that the administration must control the athletics program and Condition for Eligibility 3, which requires that the Board not be controlled by a minority of members.

Auburn is a voluntary member of SACS and consented to be judged on such matters when it joined the association. *See* Condition of Eligibility 1(a) (in maintaining accreditation with SACS, an institution agrees that "it will comply with the *Criteria for Accreditation* ... consistent with the policies and procedures of the Commission on Colleges"). Similarly, the court finds that the allegations concerning the denial of tenure to Professor Charles Curran and the admittedly vague concerns that administrators, coaches, and students were encouraged to take their concerns directly to the Board of Trustees rather than to the President come within *Criteria for Accreditation,* 6.1.2, which states that there "must be a clear distinction, in writ-

ing and in practice, between the policy-making functions of the governing board and the responsibility of the administrators and faculty to administer and implement policy."

### (2) Regulation of Business Dealings Among Trustees and the University

Auburn next argues that SACS' intention to investigate the business dealings of trustees is improper because it is based on a "widespread" but unsupported perception that one trustee may control the Board of Trustees based on his business relationships with other members of the Board of Trustees. At this stage, however, the court finds that SACS' intention to investigate this matter does not exceed the scope of the *Criteria for Accreditation* which specify *inter alia* that "[t]he board must not be controlled by a minority of board members." Section 1.4, *Criteria for Accreditation.* While Auburn may argue that the investigation is a "public attack on the integrity of these citizens," Brief, at 23, it does not offend the scope of process due at this preliminary stage. The court declines to restrict SACS' investigation into the regulation of business dealings among trustees and the University. This issue comes within the purview of SACS' *Criteria for Accreditation* 1.4 and Condition of Eligibility 3. As such, Auburn consented to be evaluated on such matters.

### C. Higher Education Act

■ Auburn argues that there is an implied private right of action under the HEA, which requires that accrediting agencies afford institutions certain due process protections during the accreditation process. 20 U.S.C. § 1099b(a)(6).

Auburn argues that the HEA's grant of federal jurisdiction supports its contention that Congress intended for educational institutions to have a private right of action against accrediting agencies. In its jurisdiction grant, the HEA states:

> Notwithstanding any other provision of law, any civil action brought by an institution of higher education seeking accreditation from, or accredited by, an accrediting agency or association approved by the Secretary ... and involving the denial, withdrawal, or termination of accreditation of the institution of higher education, shall be brought in the appropriate United States district court.

20 U.S.C. § 1099b(f). The court finds that while this section is susceptible of an interpretation that the HEA would allow such a suit, Auburn is not challenging the "denial, withdrawal, or termination of accreditation," rather Auburn is challenging the manner in which the accrediting agency is conducting an investigation into matters of accreditation. As such, the court finds that Auburn has no private right of action in the HEA under these circumstances.

### III. Conclusion

The court finds that Auburn is entitled to a certain degree of due process at this stage in SACS' investigation. Although the court does not grant Auburn any relief on its conflict of interest claim at the present time, the court is permitting discovery on this issue. The court has found that SACS must follow its own procedures in the investigation. As such, on the cross-motions for judgment on the pleadings, the court finds that SACS may not investigate whether Auburn complied with Alabama's open meeting laws, the manner in which trustees are selected for Auburn University, or the authority of the trustees to remove or select the University president. SACS conceded that it would not investigate those issues at the hearing on the parties' motions. The court further finds that SACS may not investigate the allocation of governance responsibilities with re-

spect to new minimum standards for admission, retention, and graduation, and a new grade forgiveness policy. The court, however, finds that SACS may investigate the alleged lack of institutional control over athletics and Board decisions concerning athletics; allegations concerning the denial of tenure to Professor Charles Curran; concerns that administrators, coaches, and students were encouraged to take their concerns directly to the Board of Trustees; and regulation of business dealings among trustees and the University because these issues are within the scope of SACS' *Criteria for Accreditation* and thus, proper for investigation. Finally, the court finds that the HEA does not imply a private right of action for educational institutions in suits that do not challenge the "denial, withdrawal, or termination of accreditation."

In its latest motion, Auburn further requests that SACS provide to Auburn notice of the specific matters to be investigated prior to the visit of the Special Committee, a copy of the Special Committee's report before action is taken, and an opportunity to be heard before the Commission takes action. Although Auburn requested this relief with respect to the activities of the Special Committee, the court found under SACS' policies that the appropriate committee is the Committee on Criteria & Reports. As the court reads the more formal investigative procedures promulgated by SACS, Auburn will have a copy of the report and recommendation of the C & R Committee and an opportunity to provide a written response prior to the Commission taking action.

Auburn has also requested that during its investigation, SACS maintain a record that includes (1) all persons providing information relied upon, (2) detailed and accurate summary of content of such information if not provided wholly in writing, (3) copies of all documents obtained from any source that are relied upon, (4) all internal memoranda or reports containing summaries of evidence or options or recommendations made by any employee of SACS, any member of the Special Committee, or any SACS committee or commission, and (5) decisions, including minutes or accurate summaries of meetings at which decisions are made. The court denies this relief because it is not required in SACS' rules, and Auburn will have access to SACS' administrative record in the event of an appeal. *See generally* Records Maintenance Policy, Policies, Procedures, Guidelines, at 81–82; Appeals Procedures, at 40 ("At least thirty (30) days before the date of the appeals hearing, the Commission must submit to the institution ... documents (administrative record) used by the Commission leading to and arriving at the decision regarding the institution.").

The court DENIES AS MOOT Plaintiff's motion for a preliminary injunction [3–1]; DENIES AS MOOT Defendants' motion for a protective order [15–1]; DENIES AS MOOT Plaintiff's motion to compel [17–1]; DENIES AS MOOT Plaintiff's motion for discovery sanctions [18–1]. The court GRANTS Plaintiff's motion for oral argument [35–1].

The court GRANTS IN PART AND DENIES IN PART Defendants' motion for judgment on the pleadings [23–1] and GRANTS IN PART AND DENIES IN PART Plaintiff's cross-motion for judgment on the pleadings [31–1].