HAMPTON UNIVERSITY, Plaintiff,

v.

ACCREDITATION COUNCIL FOR
PHARMACY EDUCATION,
Defendant.

Civil Action No. 4:09cv23.

United States District Court,
E.D. Virginia,
Newport News Division.

April 17, 2009.

Gilbert E. Schill, Jacob Harrison Rooksby, Nathan Adam Kottkamp, Stephanie Ploszay Karn, McGuirewoods LLP, Richmond, VA, Shepherd D. Wainger, McGuirewoods LLP, Norfolk, VA, for Plaintiff.

Michael A. Montgomery, Christina Ann MacIsaac, Bowman & Brooke LLP, Richmond, VA, Dale James Atkinson, Atkinson & Atkinson LLC, Northbrook, IL, for Defendant.

## OPINION AND ORDER

JEROME B. FRIEDMAN, District Judge.

Currently before the court is plaintiff Hampton University's ("Hampton") motion for a preliminary injunction against defendant Accreditation Council for Pharmacy

Education ("ACPE"). For the reasons stated herein, the court **DENIES** plaintiff's motion.

## PROCEDURAL HISTORY

Hampton filed its complaint in this matter on March 3, 2009, challenging the procedural fairness of ACPE's January 2009 decision to place Hampton's School of Pharmacy (the "School") on probation with respect to its accreditation status. Although Hampton's complaint claimed that it was "entitled to a temporary restraining order" (Complaint ¶ 64), it neither requested one in its prayer for relief nor filed a motion seeking one. Instead, plaintiff filed the instant motion for a preliminary injunction over two weeks later, on March 19, 2009. On April 1, 2009, the court conducted a telephonic status conference with counsel for both parties to set the date for a hearing on the instant motion. The motion was fully briefed, and a hearing was held in connection with it on April 13, 2009.

In its complaint, Hampton claims that ACPE failed to follow its own rules in imposing probation on Hampton, essentially first announcing Hampton's alleged noncompliance with ACPE standards at the same time as it imposed probation on the basis of that alleged noncompliance, and giving Hampton less than six months to address ACPE's concerns before the next decision by ACPE about Hampton's accreditation status was to be made. Hampton also claims that ACPE denied Hampton "common law due process" by, *inter alia*, failing to provide Hampton with concrete numbers, quotas, or ratios for compliance with ACPE's quantitative faculty standards, treating Hampton differently than other similarly situated programs in terms of notice, the duration of probation, and the time afforded to become compliant; failing to provide Hampton with a meaningful hearing on the imposition of probation; and failing to provide Hampton with any method of appeal of the imposition of probation. Hampton further claims that ACPE acted arbitrarily and capriciously by putting the School on probation and deprived Hampton of its federally protected due process rights to a hearing and a method of appeal in violation of 42 U.S.C. § 1983. In the instant motion, Hampton requests that the court enter an injunction through a final hearing in this matter (1) enjoining ACPE from notifying, or requiring it to retract any existing notification to, the Secretary of Education of the School's probation; (2) enjoining ACPE from publishing, or requiring it to retract any existing publication of, the School's probation on its website or in its literature or other publications; (3) requiring ACPE to provide Hampton with "fair, consistent and objective standards for faculty recruitment and retention, together with a reasonable deadline for attainment" (Hampton's Motion for Preliminary Injunction ("Mot.") ¶ 3); (4) rescinding the School's probationary status; and (5) enjoining ACPE from revoking the School's accreditation for two years.

## RELEVANT FACTS

The following relevant facts are either agreed in the parties' pleadings or drawn from the exhibits and witness testimony before the court at the hearing on the instant motion. The School has been fully accredited by ACPE since June 2002, and was never on probation prior to January 2009. According to ACPE's February 25–27, 2002 Evaluation Team Report (the "2002 Evaluation Report"), on the basis of which ACPE initially granted the School full accreditation for a period of two years, the School had at that time 26 full-time faculty members (including a Dean, an Associate Dean, and Chairs of Pharmacy Practice and Pharmaceutical Sciences), 1

parttime adjunct faculty member, and a total of 139 students in the School's professional program. Joint Consolidated Attachments Notebook for April 13, 2009 Hearing on Plaintiff's Motion for Preliminary Injunction (the "Joint Appendix" or "J.A.") Ex. 3 at 15–18; *see also* J.A. Ex. 4 (ACPE's June 27–30, 2002 Accreditation Action and Recommendations report (the "2002 A & R")).[1]

As directed by ACPE's 2002 A & R—*see* J.A. Ex. 4 at 2—Hampton submitted a written report to ACPE in May 2003, which ACPE's staff analyzed. *See* J.A. Exs. 5 (Hampton's report), 6 (ACPE's staff analysis of it). By letter dated July 22, 2003, ACPE informed the School that its accreditation status was affirmed and acknowledged "the progress the school has made since the previous review," but also reiterated its earlier "concern regarding the number of vacant faculty positions." J.A. Ex. 7 at 1.

As contemplated by the 2002 A & R, ACPE conducted a more limited site visit at the School in November 2003. The November 11–12, 2003 Focused On–Site Evaluation Report (the "2003 On–Site Report") noted that "[s]ince 2002, the quantitative strength of the Department of Pharmacy Practice has decreased (16 to 12 FTE [full-time equivalents] ) due to faculty resignations, while the number of professional year students has increased from 149 to 185." J.A. Ex. 8 at 5. The 2003 On–Site Report continues:

> As a result, the team, based on interviews, believes that the faculty members are stressed by the increase in their workloads.... In addition to the need to

replace the four open positions, as soon as possible, the team believes a minimum of two additional positions should be considered for the needs of the curriculum and to have additional flexibility, in the case of additional faculty turnover.

*Id.* The 2003 On–Site Report also noted, among other things, that

> the team is concerned that the growth in the needed quantitative and qualitative strength of the experiential education program will be jeopardized if the needed new pharmacy practice faculty are not hired in a timely manner. The original plan for continued enrollment expansion to an entry class of 70 students should not be considered until the limiting aspects of the experiential program have been resolved.

*Id.* at 6. The 2003 On–Site Report continued to address these issues in further detail, reiterating that the "need for success in recruitment cannot be overemphasized, as the resultant stress on the faculty will likely lead to further turnover if the quantitative strength of the faculty is not increased." *Id.; see also id.* at 7–10.

By letter dated January 30, 2004, ACPE informed the School that the ACPE Board had postponed a decision on continuation of the School's accreditation to allow the School to prepare an Interim Report addressing, among other issues, "the quantitative strength of the faculty and the success of the present faculty recruitment efforts." J.A. Ex. 9 at 1. The letter also indicated that "the Board may choose to invite the Dean and the President to its

---

1. For ease of reference, this Opinion and Order will cite to the parties' exhibits as contained in the Joint Appendix, which the court admitted into evidence in its entirety upon joint motion by the parties at the hearing, instead of the versions separately appended to the parties' respective briefs. Where an ex-

hibit in the Joint Appendix contains a CM/ECF header, the page numbers reflected in citations to that exhibit shall refer to the pagination contained in the header; otherwise, page references shall refer to the exhibit's own pagination, if any.

June 23–27, 2004 meeting to discuss the report and its implications on program quality." *Id.* The School submitted the requested Interim Report to ACPE in April 2004, which ACPE's staff analyzed. *See* J.A. Exs. 10 (the School's Update Report), 11 (ACPE's staff analysis of it). Around this same time, ACPE also was aware that the School's founding dean announced that she would be departing from the School at the end of the 2003–04 academic year. J.A. Ex. 11 at 1.

ACPE's June 24–27, 2004 Accreditation Action and Recommendations report (the "2004 A & R") continued the School's accreditation only for one year, because, on the basis of the 2003 On–Site Report and the School's own Interim Reports, "the ACPE Board of Directors has grave concerns regarding the adequacy of faculty resources, including the provision of the experiential component of the curriculum, to provide a quality professional degree program given an increase in class size, particularly during this period of leadership change." J.A. Ex. 12 at 1. The 2004 A & R further noted that those "concerns are of such character as to impact upon prospects for continued compliance with accreditation standards and/or may result in non-compliance with accreditation standards if not adequately addressed thereby affecting the School's accreditation status." *Id.* at 1–2. The A & R reiterated those concerns in further detail in its "Comments and Recommendations." *See id.* at 2.

As directed by the 2004 A & R, the School filed another Interim Report with ACPE, discussing these and other issues, in November 2004, which ACPE's staff analyzed. See J.A. Exs. 13 (the School's Interim Report), 14 (ACPE's staff analysis of it). By letter dated February 1, 2005, ACPE informed the School that its accreditation status was affirmed at the January

2005 Board meeting. J.A. Ex. 15 at 1. Although the Board explicitly noted in the February 1, 2005 letter the "progress made by the School regarding faculty recruitment and retention" and "acknowledged the School's intention not to exceed 60 P4 students until resources and capacity are in place to comfortably deliver the experiential component of the curriculum," the Board also "expressed ongoing concern about future capacity for pharmacy practice experiences, and current and future faculty capacity." *Id.* The Board further reiterated that it "encouraged the School to continue efforts to expand the faculty (two additional positions as recommended by the evaluation team)." *Id.* The letter also instructed the School, among other things, to provide an update by April 2005 regarding these and other ongoing matters of concern to ACPE. The School provided the requested update, which was, as usual, analyzed by ACPE staff. *See* J.A. Exs. 16 (the School's Interim Report), 17 (ACPE's staff analysis of it).

ACPE's June 23–25 Accreditation Action and Recommendations report (the "2005 A & R") again continued the School's accreditation only for one year "[b]ecause the ACPE Board of Directors has grave concerns about the adequacy of the number of faculty lines at the School of Pharmacy and the School's forecast of capacity shortages in sites to provide the pharmacy practice experiences." J.A. Ex. 18 at 2. The 2005 A & R also formally gave the School "*Cautionary Notice* owing to the seriousness of the accreditation issues." *Id.* at 1. It explained that "[i]n accord with *Cautionary Notice* procedures, the President of the University and the Dean of the School are given an opportunity to demonstrate that the professional program is and will continue in compliance with accreditation standards." *Id.* The 2005 A & R then reiterated the 2004 A & R's warning that "[p]resent concerns are of such character

so as to impact upon prospects for continued compliance with accreditation standards and/or may result in non-compliance with accreditation standards if not adequately addressed." *Id.* The 2005 A & R further explained that "[i]f non-compliance with a standard or standards is determined, the program will be given the accreditation status of probation. Adverse accreditation action, defined as withdrawal of accreditation, may subsequently be taken if the institution fails to bring the program into compliance within the time period specified by the Council." *Id.* at 1–2. The 2005 A & R continued to discuss ACPE's concerns regarding the quantity of the School's faculty in detail, and contemplated preparation of another Interim Report by the School in advance of the next site visit. *See id.* at 3.

As directed, the School submitted yet another Interim Report. *See* J.A. Ex. 19. By letter dated July 3, 2006, ACPE informed the School that its accreditation had again been affirmed, but also noted that "[g]iven the nature of the issues that have been and continue to be challenges for the School the Board reiterates the Cautionary Notice that was previously issued." J.A. Ex. 21 at 1. The July 3, 2006 letter further emphasized that "[t]he School is encouraged to hire the remaining faculty positions with haste. The Board expresses concern that the student-to-faculty ratio for several advanced pharmacy practice experiences will exceed 2:1." *Id.* The letter also noted that "[t]he focused on-site evaluation requested as a component of the [2005 A & R] has been rescheduled at the School's request for the week of November 27 through December 1, 2006," and instructed the School to submit another written report in advance of that site visit. *Id.* The School filed its Progress Report as instructed. *See* J.A. Ex. 22.

As agreed, ACPE conducted another limited site visit at the School in November 2006. The November 28–29, 2006 ACPE Focused On–Site Evaluation Team Report (the "2006 On–Site Report") noted that the School had "stabilized to some degree under the leadership of its new Dean," but noted that the "School's other administrative positions are either filled with temporary appointments or are vacant." J.A. Ex. 23 at 2. The 2006 On–Site Report continued:

> The School has filled the faculty vacancies in the Department of Pharmacy Practice, and reports twelve filled FTE in Pharmacy Practice and nine filled FTE in Pharmaceutical Sciences. In spite of the full complement of Pharmacy Practice faculty in place, the actual number of FTE appears inadequate to meet the needs of the experiential program or to provide an appropriate balance among teaching, scholarly and service responsibilities. Many of the new faculty members in Pharmacy Practice are in their first academic appointment. Of note was the concern that students voiced a good degree of dissatisfaction with the teaching skills of many of these new instructors.

*Id.* It also compiled faculty and student numbers for the School from the 2001–02 through the 2006–07 academic years. *See id.* at 9. Over this period, the faculty FTE remained constant at 26, while the number of FTE students steadily increased from 149 in 2001–02 to 235 in 2006–07. Moreover, the 26 faculty FTE included, in most years, multiple FTEs that were actually vacant: 2.5 in 2002–03, 4 in 2003–04, 1 in 2004–05, 5 in 2005–06. *Id.* On the basis of that data, the ACPE "evaluation team believes strongly that the School must adjust its faculty quantitative strength, particularly in the Department of Pharmacy Practice." *Id.* at 10.

In the January 10–13, 2007 Accreditation Action and Recommendations report (the "2007 A & R"), ACPE once again continued the School's accreditation for only one year. J.A. Ex. 24 at 1. The 2007 A & R indicated that:

> [b]ecause the School has demonstrated progress in addressing deficiencies identified during previous ACPE on-site evaluations, Cautionary Notice is removed. *However, new issues regarding the introductory pharmacy practice experiences (IPPE) and the adequacy of sites and preceptors for the advanced pharmacy practice experiences (APPE) identified during the November 28–29, 2006 focused on-site evaluation are of concern to the Board.*

*Id.* at 2. The 2007 A & R continued:

> ***Note:*** *The A CPE Board has found the program to be partially-compliant with standards that address experiential education:* **Standard No. 11: Areas and Content of Curricular Core, Standard No. 23: Faculty and Staff, Quantitative Factors, and Standard No. 29: Practice Facilities.** ACPE fully expects that the School will bring these standards into compliance; however, it must inform the School that *any Standard found to be partially compliant or non-compliant must be brought into compliance* **within two** *years as required by the United States Department of Education Regulation 602.20. Failure to bring any Standard found to be partially complaint* [sic] *or non-compliant into compliance in a timely manner (generally, within one year of this correspondence) will result in Probationary status and may result in an adverse accreditation action. Probationary sta-*

tus, as well as an adverse accreditation action, requires written notification of the U.S. Secretary of Education, the appropriate State licensing or authorizing agency, appropriate regional and/or other accrediting agencies, and the public.

*Id.*[2] According to ACPE's customary six-year cycle of comprehensive on-site evaluations, ACPE suggested that such a comprehensive site visit take place in spring 2008 "to give the program adequate time for preparing for its self-study." *Id.* at 2.

That visit, which was originally scheduled (in keeping with ACPE's above suggestion) for spring 2008, was rescheduled at ACPE's request (*see* J.A. Ex. 26 at 1), and with the School's agreement (*see* J.A. Ex. 29 at 1), to fall 2008. Pursuant to this rescheduling, ACPE sent a letter to the School dated March 4, 2008, confirming the fall 2008 Comprehensive Site Visit and extending the School's accreditation term to January 2009. *See* J.A. Ex. 30 at 1. The School submitted a lengthy Comprehensive Self–Study Report to ACPE in September 2008 (the "2008 Self–Study")—*see* J.A. Ex. 33—and the comprehensive site visit took place as agreed in October 2008. Although the October 21–23, 2008 ACPE Evaluation Team Report (the "2008 On–Site Report") acknowledged that "[i]n most areas the School has made reasonable progress in most areas since the last comprehensive site visit (in 2002)," it also simultaneously cited "[o]ne notable exception, which was addressed in the report of the ACPE focused visit to the School in 2006, was the lack of progress in recruiting faculty." J.A. Ex. 35 at 6. The 2008 On–Site Report discussed the School's shortcomings in detail, again noting the 2006

---

**2.** ACPE offered uncontroverted testimony at the hearing on the instant motion that "partial compliance," from the perspective of the Department of Education, is no different from "non-compliance." ACPE simply uses "partial compliance" to indicate different shades of non-compliance.

On–Site Report's identification of these issues and indicating:

> Although considerable effort has been made by the School during the past two years to recruit additional faculty, and to recruit faculty in particular disciplines, these efforts have not produced the desired results. In 2006 (at the time of the focused visit) the School had 21 full-time faculty members (12 in Pharmacy Practice and 9 in Pharmaceutical Sciences). Today, the School has a total of 19 full-time faculty (10 in Pharmacy Practice and 9 in Pharmaceutical Sciences). Throughout the history of the School there appears to have been difficulty with faculty retention, and during some years any gains in faculty recruitment have been offset by attrition.

*Id.* at 44. More specifically, the 2008 On–Site Report noted, among other related issues, that members of the School's faculty "indicated that low salaries are a major disincentive to work" there, there was "no member of the faculty who has an academic background in the social/behavioral/administrative sciences," there was "only one faculty member in the area of pharmaceutics, which seems inadequate to meet the needs of the curriculum," and both department chair positions were vacant, being filled only with interim chairs. *Id.* at 45. The 2008 On–Site Report concluded that the School did not meet Standard 24 of ACPE's 2007 Standards (equivalent to Standard 23 of ACPE's earlier 2000 Standards, which were still in effect at the time ACPE issued the 2007 A & R). The site visit team instructed the School to provide a follow-up report on these and other issues in November 2008. *See* J.A. Ex. 36 at 1. The School provided a brief supplemental report as requested. *See* J.A. Ex. 37.

In late 2008, ACPE and Hampton exchanged correspondence regarding the 2008 On–Site Report, the School's supplemental report, and the ACPE Board's upcoming meeting in January. *See* J.A. Exs. 38–40. Upon receiving notification from ACPE that the School's accreditation was in jeopardy, and that representatives from Hampton were to be invited to give a presentation at the January 2009 Board meeting in that connection, Hampton's Provost inquired by email as to ACPE's reasons. *See* J.A. Ex. 38 at 1. ACPE's Associate Executive Director and Director of Professional Degree Program Accreditation replied by email, indicating that "the major concerns identified [in the 2008 On–Site Report] were the quantitative strength of the faculty and the adequacy of financial resources. These have been issues for some time, and thus have now risen to a higher level of concern." J.A. Ex. 39 at 1. The email reply from ACPE noted that its invitation to Hampton representatives to meet with the Board in January 2009 "does not presume an adverse action will be taken, but rather is intended to alert you to the fact that the Board has serious concerns that need to be addressed, and a definitive response is what is sought." *Id.*

In mid-December 2008, Hampton's Provost received an email confirming the School's "appointment with the ACPE Board." J.A. Ex. 40 at 1. The email confirmation indicated that the School's "appointment time includes a brief 15–minute presentation by you and your colleagues, which should be an update only to the information previously submitted to ACPE. No handouts will be distributed at the meeting." *Id.* Hampton's Provost and the School's dean did, in fact, attend the January 2009 Board meeting, where each presented for approximately five minutes, and then answered a few questions from Board members during the remaining five minutes.

In its January 7–11, 2009 Accreditation Action and Recommendations (the "2009 A & R"), the Board considered the School's 2008 Self–Study, other correspondence between the parties, the 2008 On–Site Report, and the School's presentation to the Board. The Board decided to extend the School's accreditation only through June 30, 2009, and placed the School's accreditation status on probation during that time, because it found the School not to be in compliance with ACPE Standard 24 (quantitative faculty and staff factors) and only partially in compliance with ACPE Standard 30 (financial issues relating to faculty salaries). J.A. Ex. 41 at 2. The 2009 A & R explained:

> The School was found by the ACPE Board to be *Partially Compliant* with both of these standards at its January 10–13, 2007 meeting. The School was notified at that time that *any Standard found to be Partially Compliant or Non–Compliant must be brought into compliance **within two years** as required by the United States Department of Education Regulation 602.20. Since the School has not yet resolved the issues previously reported, the ACPE Board has the option of withdrawing accreditation at this time. However, the Board instead voted to continue accreditation through **June 30, 2009.** thereby allowing the School additional time to correct the areas of Non–Compliance or Partial Compliance noted above.*
>
> The ACPE Board of Directors expresses its *grave concern* regarding the School's continued failure to meet the expectations of Standards 24 and 30 and asks the School to present a *detailed plan* by *May 1, 2009* to address the situation. Failure to deliver the requested plan or failure to act upon that plan in a timely manner will force ACPE to consider an adverse accreditation action (i.e., with-

drawal of accreditation status). The School Dean and other School or University officials are invited to meet with the ACPE Board of Directors at its June 24–28, 2009 meeting to discuss this plan and review any program made.

> It is ACPE's policy that any program with Probationary status must submit *an exit strategy/plan* that can be implemented should the program's accreditation be withdrawn.

*Id.* The 2009 A & R also instructed the School to provide another Interim Report. It also noted elsewhere that although "Probation reflects a diminished accreditation status ... graduates of a program that has been placed in a Probationary status retain all rights and privileges associated with an accredited program." *Id.* at 9.

Hampton's Provost wrote a letter to the Executive Committee of the Board dated January 26, 2009, taking issue with the Board's decision regarding probationary status and "requesting that the Executive Committee of the ACPE Board of Directors reconsider the impact that probation will have on an otherwise strong program. It will thwart our ability to attract and retain faculty—the very standard that the accrediting body has charged us to address." J.A. Ex. 42 at 1–2. By letter dated February 9, 2009, the Executive Committee of the Board informed Hampton's Provost that it had "determined that it is not in a position to change the action of the entire Board, taken at its January 7–11, 2009, meeting, nor is it in a position to engage the Board in any further accreditation action prior to the June 2009 meeting of the entire Board." J.A. Ex. 44 at 1. The letter further indicated that "the action taken by the Board ... will be published in accord with ACPE policies and procedures." *Id.*

By letter dated February 24, 2009, Hampton's counsel formally requested an appeal of the Board's decision to put the School's accreditation status on probation. J.A. Ex. 46 at 3. ACPE's counsel informed the School that ACPE would not grant the request for an appeal of the decision to impose probation, and Hampton subsequently filed this lawsuit.

## STANDARD OF REVIEW

In deciding a motion for a preliminary injunction, the court must consider: (1) the likelihood of irreparable harm to the plaintiff should the court refuse to grant the injunction; (2) the likelihood of harm to the defendant should the court grant the injunction; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 193 (4th Cir.1977). Of the foregoing factors, balancing the harm to the plaintiff against the harm to the defendant is the most important consideration. Consequently, the court must first address this balancing of the equities, and then weigh the remaining factors accordingly. If the balance of harm tips decidedly in favor of the plaintiff, then the required showing of a likelihood of success on the merits is lessened, and the plaintiff need only show a possibility, rather than a probability, of success. *See MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339–40 (4th Cir. 2001); *Blackwelder*, 550 F.2d at 195: *see also Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 271 (4th Cir.2002). When the balance of hardship "does not tilt decidedly in plaintiff's favor," then a plaintiff must demonstrate a "strong showing of likelihood of success" or a "substantial likelihood of success" by "clear and convincing evidence" in order to obtain relief. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 818 (4th Cir.1991).

Finally, the court must also consider the public interest dimensions and consequences of granting or denying the requested relief. The U.S. Supreme Court has explained that courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (citing *R.R. Comm'n v. Pullman Co.*, 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971 (1941)). The *Weinberger* Court further explained, quoting *Yakus v. United States*, 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834 (1944), that " '[t]he award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff,' and that 'where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.' " *Weinberger*, 456 U.S. at 312–13, 102 S.Ct. 1798 (alteration in original).

## ANALYSIS

**I. The Likelihood of Irreparable Harm to Plaintiff if the Injunction Is Not Granted**

Although both parties have raised legitimate claims of harm, it is clear to the court that the balance of harms at issue on the instant motion tips in favor of Hampton. The potential irreparable harm to the School if ACPE withdraws its accreditation is obvious and considerable. In a similar vein, regardless of whether, as a matter of legal definitions under Department of Education regulation 34 C.F.R. § 602.3, the School's probationary, "dimin-

ished accreditation" status can or cannot be construed as an "adverse action"—an issue that this court need not, and will not, decide at this juncture—as a practical matter, it is undoubtedly already having an adverse impact on the School's faculty and current students, not to mention the School's fall 2009 incoming class or students currently considering applying to the School. The School's current probationary status is likely leading some current students to consider transferring, or to apply for transfer, to other schools of pharmacy, and current faculty members may well be currently seeking positions at other schools or considering other academic or non-academic career options. Accepted prospective students may choose to attend another school, and students considering applying to the School may cross it off their lists.

If the ACPE Board decides in June to withdraw the School's accreditation, of course, all of these problems will only be exacerbated, and such withdrawal might effectively sound the death knell for the School entirely. The unfortunate and obvious irony of this situation, as noted in the January 26, 2009 letter from Hampton's Provost to the Executive Committee of the ACPE Board—J.A. Ex. 42 at 2—is that the very event that creates the greatest and most immediate motivation for a pharmacy school or program to address its problems (*i.e.*, being put on probation by the ACPE Board) creates at the same time perhaps the greatest impediment to that school or program's ability actually to do so, especially when those problems relate to faculty recruiting and retention. Accordingly, this case appears to involve a prime example of potential irreparable harm to a plaintiff. That being said, of course, it appears that, notwithstanding probation and the corresponding possibility that accreditation will be withdrawn entirely, the School has, in fact, been able to attract the interest of several new faculty members.

## II. The Likelihood of Harm to Defendant if the Injunction Is Granted

Although Hampton suggests that granting the injunction it requests would not harm ACPE in any meaningful way, ACPE rightly counters that doing so would undermine the perceived integrity of the accreditation process. ACPE has argued that, from its perspective, at least, probation does not constitute an "adverse action," and has emphasized repeatedly its contention—indeed, its hope—that the threat of the School actually losing accreditation in June 2009 is speculative, at best, and, in any case, certainly not a foregone conclusion. ACPE also has pointed out that, if the Board were actually to withdraw the School's accreditation (which clearly would be an "adverse action" under applicable Department of Education regulations), 20 U.S.C. § 1099b(a)(6) would then provide the School with the right to appeal that decision by the Board, during the pendency of which the School would retain its accreditation.

The court must also consider whether granting an injunction in this case would set a precedent that might lead every pharmacy school or program accredited by ACPE to sue and move for a preliminary injunction if ACPE places it on probation. As ACPE explicitly noted in the 2009 A & R, the Board had "*the option of withdrawing accreditation at* [that] *time. However, the Board instead voted to continue accreditation ... allowing the School additional time to correct the areas of Non–Compliance or Partial Compliance noted above.*" J.A. Ex. 41 at 2. It appears from the uncontroverted testimony at the hearing on the instant motion that ACPE is not required to afford a probationary period, but does so voluntarily to provide schools

and programs with extra time to address compliance issues. ACPE indicated that the prospect of injunctions such as the one requested here might well deter it from continuing to provide such additional notice. Although this possibility, by itself, certainly would not suffice to deter a court from entering an injunction that it otherwise deemed appropriate, it remains one factor for the court to consider.

## III. The Likelihood or Possibility that Plaintiff Will Succeed on the Merits

Although Hampton's complaint purports to allege at least four distinct causes of action, its claims actually appear to fall into two basic categories: claims under "common law due process" and claims under 42 U.S.C. § 1983 of deprivation of federally protected rights. Falling into the former category are Hampton's claims that ACPE failed to follow its own rules, procedures, and policies and acted arbitrarily and capriciously in imposing probation on the School, failing to provide Hampton with concrete numbers, quotas, or deadlines for compliance with ACPE's quantitative faculty Standard, treating Hampton differently than other similarly situated programs in terms of notice, the duration of probation, and the time afforded to become compliant, failing to provide Hampton with a meaningful hearing on the imposition of probation, and failing to provide Hampton with any method of appeal of the imposition of probation. Falling into the latter category are Hampton's further claims that ACPE deprived Hampton of its federally protected due process rights to a hearing and a method of appeal.

The court reiterates here that this case is currently before it only on a motion for a preliminary injunction, not on a motion to dismiss or for summary judgment. Accordingly, in assessing the likelihood of

success under the applicable test, this court does not purport to decide definitively the merits of Hampton's causes of action. Instead, since the court has determined that the balance of harms clearly tips in favor of Hampton, it must only determine whether Hampton, by raising serious questions in its complaint, has shown a possibility, rather than a probability, of success. *See MicroStrategy*, 245 F.3d at 339–40; *Blackwelder*, 550 F.2d at 195; *see also Scotts*, 315 F.3d at 271.

ACPE argues that Hampton cannot succeed on the merits because (1) Hampton's claims are not ripe, because ACPE has not yet taken any "adverse action" against the School; (2) the U.S. Court of Appeals for the Fourth Circuit has not explicitly recognized or discussed a private right of action for violations of "common law due process;" and (3) Hampton's § 1983 claim is not viable because accrediting organizations are not state actors and, moreover, no federally protected due process rights are implicated here.

With respect to (1), the court believes that Hampton's claims are ripe for consideration. Probation has already been imposed on the School, and there is clearly at least some possibility that ACPE's Board could decide to withdraw the School's accreditation at the end of June—little more than two months from now. As one federal district court pointed out when faced with a similar argument in another accreditation case, the "harm if accreditation is withdrawn is real and substantial. [A school or program] need not wait for the axe to fall before seeking an injunction." *W. State Univ. of S. Cal. v. Am. Bar Ass'n*, 301 F.Supp.2d 1129, 1137–38 (C.D.Cal. 2004). In *Western State*, the plaintiff's school of law sought a preliminary injunction to prevent the American Bar Association from implementing any final decision regarding the law school's accreditation,

which had only been granted on a temporary, provisional basis that was about to expire. Western State had been given a hearing and had already exhausted its administrative appellate remedies, but it claimed that its request for reconsideration had not been considered and that its time for appeal to various ABA bodies was of insufficient duration. The district court there concluded that Western State had at least raised serious questions with respect to its "common law due process" claim, and that the balance of harms favored Western State. The court granted the preliminary injunction.

With respect to (2), it appears to be true that the Fourth Circuit has not explicitly endorsed a right of action under a theory of "common law due process." *See St. Andrews Presbyterian Coll. v. S. Ass'n of Colls & Schs., Inc.*, Case No. 1:07CV00640, 2007 WL 4219402, at *3 n. 5 (M.D.N.C. Nov. 29, 2007) ("The Fourth Circuit has not addressed the issues of due process in the school accreditation setting or 'common law due process' in any setting."). However, ACPE does not cite any authority for the proposition that the Fourth Circuit has expressly rejected such a cause of action, and it is clear that courts in several other jurisdictions have acknowledged the existence of such claims, at least in the accreditation context. *See, e.g., McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 534–35 (3d Cir.1994) (collecting cases in which "courts have recognized a state or common law duty on the part of 'quasi-public' private professional organizations or accreditation associations to employ fair procedures when making decisions affecting their members"); *Wilfred Acad. of Hair and Beauty Culture v. S. Ass'n of Colls. & Schs.*, 957 F.2d 210, 214 (5th Cir.1992); *Marjorie Webster Junior Coll., Inc. v. Middle States Ass'n of Colls.& Secondary Schs., Inc.*, 432 F.2d 650, 655–58 (D.C.Cir.

1970); *W. State*, 301 F.Supp.2d at 1135–36; *St. Agnes Hosp. of the City of Baltimore, Inc. v. Riddick*, 748 F.Supp. 319, 337–38 (D.Md.1990).

For purposes of the instant motion, because the court has concluded that Hampton "has raised sufficient questions going to the merits for its common law due process claim, there is no need to consider" the viability of its other claims. *St. Andrews*, 2007 WL 4219402, at *3. Thus, with regard to (3), it will more than suffice for the court to note that several other courts have held that the actions of private accreditation organizations, including withdrawal of accreditation, do not constitute state action, a necessary element of any due process claim under 42 U.S.C. § 1983. *See, e.g., McKeesport*, 24 F.3d at 523–26 (collecting cases and concluding there to be no state action by the accrediting organization). There, the Third Circuit explained that "[i]n cases involving accreditation organizations other than the ACGME, a number of courts have not found state action." *Id.* Indeed, the Third Circuit further noted that, although it had also found a handful of accreditation cases in which state action was found, it noted that the decisions either antedated important U.S. Supreme Court decisions relating to the contours of state action or were subsequently drawn into question by the court originally reaching them in light of intervening Supreme Court decisions. *Id.* at 523–24.

In the more recent case of *Auburn University v. Southern Association of Colleges & Schools, Inc.*, the district court discussed at length the question of state action in the accreditation context, noting the somewhat unusual development of "common law due process" despite the fact that "courts seem equally compelled to deny that accrediting agencies are state actors." 489 F.Supp.2d 1362, 1369–74 (N.D.Ga.

2002) (collecting cases). There, the district court considered whether the Supreme Court's decision in *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001), in which the Supreme Court found the defendant, "a not-for-profit membership corporation," to be "a state actor subject to suit under 42 U.S.C. § 1983," altered the analysis of past cases. *Auburn*, 489 F.Supp.2d at 1373. The district court concluded that "[i]t may be that the Court's 'pervasive entwinement' theory articulated in *Brentwood Academy* will supercede the legal fiction of courts denying that accrediting agencies are state actors, but declaring them to be 'quasi public' organizations bound by 'common law due process.'" *Id.* In *Western State*, however, where the plaintiffs relied on *Auburn* to make precisely this argument, the district court concluded, in assessing the plaintiffs' motion for a preliminary injunction, that "[t]here is insufficient showing the ABA is a state actor. Because the ABA is not shown to be a state actor, Plaintiffs cannot demonstrate sufficient likelihood of success on their Fifth Amendment due process claim." 301 F.Supp.2d 1129, 1133–34 (also collecting cases).

In light of the foregoing analysis, and on the record currently before the court, it cannot conclude that Hampton has *no* chance of success on the merits, at least with respect to its "common law due process" claims. Accordingly, it appears that Hampton has met this requirement of the *Blackwelder* test.

## IV. The Public Interest

Any matter involving an institution of higher learning will implicate the public interest, locally and (varying with the geographic reach of the particular school) even nationally or internationally. In this case, however, the court believes the public interest is of particular relevance because the institution at issue here is not merely a college or university, but a school that educates licensed medical professionals. Consequently, as discussed further below, public interest in this case also implicates concerns about public health and public safety.

Whatever ACPE's state or non-state actor status might be, it is clear that it, like other accreditation organizations, is a private entity that effectively acts in the public interest. Indeed, its mission "in large part, is to assure and advance quality in education for the profession of pharmacy. In seeking to fulfill this mission, ACPE establishes standards for the accreditation of pharmacy programs, and enforces those standards." Memorandum of Accreditation Council for Pharmacy Education in Opposition to Plaintiff's Motion for Preliminary Injunction ("Opp'n") at 2. Although Hampton obviously has a strong interest in preserving the School and its community of students and faculty, ACPE has an arguably stronger interest in protecting not only the educational interests and prospective credentials of the School's current and prospective students, but also in protecting the public from students or graduates whose educational experience did not meet certain minimum criteria being allowed to become candidates for state licensure as pharmacists.

The court certainly does not want to overstate the nature or severity of the accreditation problems that the School is currently facing. Indeed, it is the sincere hope of this court (and, it appears from the testimony at the hearing, also of ACPE) that Hampton's efforts to remedy the School's faculty recruiting and retention issues prove successful. However, it is also not hyperbole to say that, where a case involves medical professionals such as

pharmacists, who are responsible for preparing and dispensing life-saving (and, in some cases of error, life-threatening) medications in hospitals and directly to the public, the case necessarily also involves issues of life or death. The court believes that entering an injunction that would interfere with ACPE's ability to enforce its standards would clearly be against the interests of public health and safety implicated in this case. Accordingly, although Hampton appears to have fulfilled the other *Blackwelder* prerequisites to the availability of injunctive relief, the court finds that the strong countervailing public interests at stake in this case oppose granting such relief. *See Weinberger*, 456 U.S. at 312–13, 102 S.Ct. 1798.

## V. Discussion

■ On the basis of the foregoing analysis, the court believes that the circumstances of this case, as the court currently understands them to be, simply do not merit the injunctive relief Hampton requests. The thrust of Hampton's arguments in support of the instant motion and, indeed, of its complaint in this case generally, is that the School was essentially blind-sided by ACPE's imposition of probationary status, and has not been given sufficient notice or time to address and remedy the issues on the basis of which that probationary status was imposed. However, it thus far appears clear from the documentary evidence and testimony in this case—discussed in detail above—that this was far from the first time that ACPE had raised these issues regarding faculty quantity and retention with the school. The email response of ACPE's Associate Executive Director to Hampton's Provost in late 2008 perhaps puts it best:

"the major concerns identified [in the 2008 On–Site Report] were the quantitative strength of the faculty and the adequacy of financial resources. These have been issues for some time, and thus have now risen to a higher level of concern." J.A. Ex. 39 at 1. Although it is equally apparent to the court that, in the words of ACPE's 2008 On–Site Report, "considerable effort has been made by the School during the past two years to recruit additional faculty, and to recruit faculty in particular disciplines, these efforts have not produced the desired results." J.A. Ex. 35 at 44. The court also recognizes that the School appears to have redoubled its efforts in recent months, apparently with some success, to bolster the size of its faculty.[3] The simple arithmetic fact that the number of faculty at the School has declined while, over the same period, the number of students at the School has increased significantly cannot be ignored.

Even if the factual record did not so clearly demonstrate the substantive basis for ACPE's imposition of probation (*i.e.*, ACPE's repeated warnings over the years to the School regarding its seemingly perennial faculty recruiting and retention problems), the court must defer to ACPE's substantive findings. Courts in many Circuits, including within the Fourth Circuit, have repeatedly emphasized in no uncertain terms the great deference that should be afforded to accrediting organizations with respect to their substantive standards and professional judgment. *See. e.g.*, *Thomas M. Cooley Law Sch. v. Am. Bar Ass'n*, 459 F.3d 705, 713 (6th Cir.2006); *Ambrose v. New England Ass'n of Schs. & Colls., Inc.*, 252 F.3d 488, 498 (1st Cir. 2001); *McKeesport*, 24 F.3d at 534;

**3.** Indeed, according to the testimony at the hearing on the instant motion, the School has apparently focused on faculty recruiting efforts even to the exclusion of devoting time to other aspects of its ongoing obligations to ACPE, such as the preparation of an exit strategy if accreditation were lost.

*Wilfred,* 957 F.2d at 214 (reversing a district court's entry of injunction against accreditation organization because district court did not afford the organization's decision sufficient deference); *Marjorie Webster,* 432 F.2d at 657; *W. State,* 301 F.Supp.2d at 1135; *Auburn,* 489 F.Supp.2d at 1370; *St. Agnes,* 748 F.Supp. at 330. Entering an injunction revoking ACPE's imposition of probationary status could hardly be considered deference to ACPE's professional judgment.

Entry of the requested injunction against ACPE in this case would have several other significant consequences, all of which counsel against doing so. First, such an injunction would potentially interfere with ACPE's ability to fulfill its obligations under the regulations that apply to it, such as United States Department of Education Regulation 602.20, which is cited by ACPE in its A & R reports. Second, an injunction maintaining the *status quo* of the School's accreditation status would not necessarily do anything to maintain the *status quo* at the School itself. The court must consider the possibility that, if an injunction were entered, conditions at the School, instead of improving, could conceivably deteriorate further while the injunction was in effect. At what point might such developments justify alteration or dissolution of the injunction, and how would the issue be revisited?

Hampton has also requested that the injunction continue the School's accreditation for a period of two years. If the ACPE Board determines at its June 2009 meeting that the School has, in fact, not returned to compliance with ACPE Standards, and concludes on that basis that the School's accreditation must be removed, how could the court allow its injunction to persist, in light of the great deference it must afford to ACPE's substantive determinations? Moreover, the court cannot

help but note in this connection that complying with Hampton's request would actually afford the School a *longer* extension of its period of accreditation than it has enjoyed since ACPE first granted it accreditation in 2002. Nothing in the record would justify this court being *more* permissive with respect to the School's accreditation status than ACPE has been in the past.

Finally, the court notes that although this case bears, at least superficially, some factual resemblance to the very recent litigation between Xavier University and ACPE—*see Xavier Univ. of La. v. Accreditation Council for Pharmacy Educ.,* Case No. 2:09cv2675 (E.D.La.) (filed Feb. 10, 2009)—the testimony at the hearing on the instant motion showed the *Xavier* case to be distinguishable for several reasons, not least of which are the extraordinary circumstances in which that university found itself as a result of Hurricane Katrina. In any case, the *Xavier* litigation was settled prior to any action by the district court, and therefore provides no concrete guidance for this court's consideration of the instant motion.

**CONCLUSION**

The court, after analyzing this case according to the *Blackwelder* factors, has concluded that the balance of harms tips decidedly in Hampton's favor. Moreover, it appears from a review of relevant case law that Hampton has raised serious questions, at least with respect to its "common law due process" claims, sufficient to establish some possibility of success on the merits. However, the court has determined that the weighty public interests at stake in this case, as well as its specific factual circumstances, counsel against granting a preliminary injunction. Accordingly, for the foregoing reasons, the

court **DENIES** Hampton's motion for a preliminary injunction.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to counsel of record for the parties.

It is so **ORDERED.**